# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

IN RE                                          )
                                               )          **Case No. 11-21337-TLM**
**MARTIN D. FRANTZ,**                          )
**CYNTHIA M. FRANTZ,**                         )
                                               )          **Chapter 7**
                          **Debtor.**          )
_____ )

## MEMORANDUM OF DECISION ON
## MOTION FOR STAY PENDING APPEAL
_____

On February 4, 2015, this Court entered an "Order Authorizing Sale of

Real Property," Doc. No. 388 ("Order").  The Order followed a February 3, 2015

hearing and oral ruling.  The Court authorized the sale of real property located at

28825 N. 160th St., Scottsdale, Arizona (the "Property"), by chapter 7 trustee,

David P. Gardner ("Trustee"), over the objection of Martin and Cynthia Frantz

("Debtors").

On February 4, immediately after entry of the Order, Debtors filed a

"Motion to Stay Sale of Property," Doc. No. 389 ("Motion").  The Motion cites

Rule 8007 and requests a stay pending appeal.[1]  *Id.* at 1.  The notice of appeal,

_____

[1]  Unless otherwise indicated, citations to the "Rules" are to the Federal Rules of
Bankruptcy Procedure, and citations to statutory provisions are to the Bankruptcy Code, Title 11
U.S. Code, §§ 101–1532.

MEMORANDUM OF DECISION - 1

Doc. No. 403, was filed 12 days later on February 16.[2]  The Motion was set for

hearing on February 17, as directed by the Court.  *See* Doc. No. 391.  Counsel for

Debtors and counsel for Trustee appeared on February 17 and presented

arguments, and the Motion was taken under advisement.[3]

## BACKGROUND AND FACTS[4]

Debtors filed a voluntary chapter 11 case on October 17, 2011.  On April

23, 2013, the case was converted to chapter 7 on a motion stipulated to by

Debtors.  Doc. Nos. 185, 187, 193.

On July 31, 2014, Trustee sought turnover of the Property in order to sell it.

Doc. No. 301.  While Debtors had consistently scheduled the Property as worth

$310,000, Trustee's investigation indicated it could have a value of $400,000 to

$450,000.  Trustee further noted that the Property was encumbered by a lien in

---

[2]  Effective December 1, 2014, the Rules expressly provide that a motion for stay pending appeal may be filed before the notice of appeal is itself filed, *see* Rule 8007(a)(2), though a motion for stay pending appeal is not a motion that tolls the time for filing an appeal, *see* Rule 8002(b)(1).

[3]  Subsequent to the filing of the Motion and prior to the hearing, Debtors filed an "amended motion" and a "supplement" to the amended motion, Doc. Nos. 399, 400.  These filings have been considered by the Court and are considered to be part of, and are subsumed in its discussion of, the Motion.

[4]  The Court takes judicial notice of its files and records to outline the history of the case and the present disputes.  However, as it cautioned counsel at hearing, taking notice of what was filed, and when, does not mean the contents of the filings necessarily have evidentiary weight. *Credit Alliance Corp. v. Idaho Asphalt Supply, Inc. (In re Blumer)*, 95 B.R. 143, 146–47 (9th Cir. BAP 1988); *see also Mora v. Vasquez (In re Mora)*, 199 F.3d 1024, 1026 n.3 (9th Cir. 1999) (citing *Blumer* with approval).  *But see In re Vee Vinhnee*, 336 B.R. 437, 449 (9th Cir. BAP 2005) (entries on debtor's verified bankruptcy schedules and statements, when offered against debtor, have evidentiary effect under Fed. R. Evid. 801(d)); *Jordan v. Kroneberger (In re Jordan)*, 392 B.R. 428, 444 n.32 (Bankr. D. Idaho 2008) (same).

MEMORANDUM OF DECISION - 2

favor of Wells Fargo Bank, that Debtors had not claimed an exemption, and that it appeared there was equity for the benefit of creditors.[5]  The turnover motion was granted without objection in August 2014.  Doc. No. 310.  Trustee then employed a realtor, Linda Salkow, to assist in selling the Property.  Doc. Nos. 312, 320.

### A.    The First Proposed Sale

On October 9, 2014, Trustee proposed a sale of the Property under § 363(b)(1).  Doc. No. 323.  This was to be a private sale to Charles and Diana Mettille for $480,000 with a closing by December 15, 2014.  The Mettilles would pay the $480,000 to the estate through cash of $120,000 and a new loan for the remaining $360,000.  These sale proceeds were projected to satisfy the Wells Fargo Bank secured claim (shown in the notice as approximately $341,700) and fees and costs of $19,200, leaving net proceeds of about $119,100.

Trustee noted that the commission to the approved broker would be $28,800.[6]  Trustee also noted that his "allowable compensation" would be $27,250.[7]  Thus, Trustee projected $63,051.49 would be available for creditors

---

[5]  On July 1, 2014, Wells Fargo Bank sought stay relief and alleged the Property had a $310,000 value (based on Debtors' schedules) and an outstanding debt of $335,955.72 as of June 2014.  Doc. No. 294.  Though it appears no objection was filed, Wells Fargo Bank has not sought entry of an order on its motion.

[6]  Salkow was employed on a 6% commission basis.  Doc. No. 320.  The calculated commission ($480,000 x .06 = $28,800) would be payable only after a proper application and order.

[7]  Though not there explained, this appears to be a reference to Trustee's evaluation of the formula under § 326(a) as applied solely to the $480,000 figure.  The compensation to

(continued...)

MEMORANDUM OF DECISION - 3

from the sale.  Objections to the proposed sale were due by November 3, 2014.
*Id.*

Debtors objected to the sale.  Doc. No. 325.  Debtors' arguments flowed generally from Trustee's calculations, but Debtors also asserted that the Wells Fargo Bank obligation was $3,080.42 higher than Trustee's estimate, resulting in a projected "net" of $59,971.07 rather than $63,051.49.  Debtors alleged they would pay an amount greater than the recalculated "net" amount by borrowing the necessary funds from family members to cure the Wells Fargo Bank debt and pay the additional required sums to Trustee, and secure such a new loan with a second deed of trust on the Property.  *Id.*  This objection was set for hearing on November 4.  Doc. No. 326.

Trustee responded to the objection.  He noted that Debtors had not made an actual purchase proposal, despite knowing since August that Trustee intended to sell the Property and had retained a broker to assist him.  Trustee also argued that Debtors had not shown an ability to make, or close, the suggested offer.  Trustee

---

[7](...continued)
trustees, however, does not come directly from sales proceeds on a sale-by-sale or asset-by-asset basis but is calculated at the conclusion of a case based on "all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims."  *See* § 326(a); *see also In re Hokulani Square, Inc.*, 2015 WL 305540 (9th Cir. Jan. 26, 2015).  In the Court's experience, most chapter 7 trustees do not attempt to predict, estimate or address potential § 326(a) compensation in their § 363 sale notices; rather, they restrict the discussion to amounts payable directly out of the proceeds, such as closing costs, real property taxes, title insurance, broker or auctioneer compensation, and the like.  If Trustee here had taken that approach, a "net" of $90,301.49 would have been shown as available from the sale after normal closing costs and the realtor's proposed commission.

MEMORANDUM OF DECISION - 4

stated that, in his business judgment, the arms' length transaction with the

Mettilles as cash buyers was in the best interests of creditors and superior to

Debtors' suggested proposal.  Doc. No. 333.

A "supplemental" objection was then filed by Debtors on October 30.  Doc.

No. 338.  It asserted that the amount needed to cure the Wells Fargo Bank debt

was higher still, changing the amount Debtors calculated as necessary to match

and beat the offer Trustee had accepted.

At the November 4 hearing, the Court orally sustained Debtors' objection

to the sale though only to the extent of postponing the sale for two weeks.  It

required that, within such period, Debtors not only deposit or show undisputed

proof of the availability of funds required to bring Wells Fargo Bank current (the

alternative to paying Wells Fargo Bank off with the proceeds of a cash sale as

Trustee had proposed), but also show the availability of funds that exceed what the

estate would receive under Trustee's pending sale to the Mettilles.  The two weeks

to accomplish this required showing was a relatively short time but appropriate

given (a) Debtors' representations as to their ability to perform and (b) the risk that

Trustee would lose a ready, willing and able cash buyer.

On November 19, Trustee requested an order approving the Mettille sale

because Debtors had not met and performed the required conditions.  Doc. No.

345.  Later that same day, Debtors objected to the request.  Doc. No. 346.  Trustee

set the request for hearing on December 1.  Doc. No. 348.

MEMORANDUM OF DECISION - 5

Debtors' objection raised arguments about how (and how much) the realtor should be compensated if Debtors, and not a third party, were the ultimate purchasers. Debtors also argued that the amount required to cure Wells Fargo Bank was "in dispute" as was the "method of computation" of Trustee's compensation. In a subsequent filing, Debtors questioned whether the Mettilles were good faith purchasers because Ms. Mettille was a real estate agent and there was an "inference" that the listing price was established with consideration of Ms. Mettille receiving a "shared commission" with Ms. Salkow thus tainting the "integrity" of the sale. Doc. No. 353. Debtors noted they had scheduled December 8 depositions to explore such matters. Those depositions, however, would occur after the December 1 hearing.

On December 1, after argument, the Court entered an oral decision overruling Debtors' objections and approving Trustee's sale. That decision rested on Debtors' concession that they had failed to perform consistent with the terms and conditions imposed by the Court in its November 4 ruling. An order approving the sale at $480,000 to the Mettilles was entered on December 3, 2014. *See* Doc. No. 356. That order was not appealed. The sale to the Mettilles, however, failed to close. *See* Doc. No. 367 (Trustee's January 8 status report).

**B.    The Second Sale Proposal**

On January 9, 2015, Trustee proposed a § 363(b)(1) private sale of the Property to Castle Property Investment, LP ("CPI") for $454,000 cash. After

MEMORANDUM OF DECISION - 6

deducting the Wells Fargo Bank payoff (estimated at $351,270.61), taxes, fees, dues and closing costs, Trustee estimated a net remaining of $96,977.40. Doc. No. 370. Once again, Trustee noted the projected realtor's commission[8] and his own estimated § 326(a) compensation. *Id.* at 2. Objections were due by February 2, and a hearing was scheduled for February 3 to approve the sale. Doc. No. 372.

On January 29, Debtors filed amended schedules. Doc. No. 377. In an amended schedule A, they asserted the value of the Property was $414,000, a change from the $310,000 they had consistently asserted in several schedules filed throughout the case. They also claimed on an amended schedule C an exemption in the Property under § 522(d)(1) in the amount of $45,950 (representing $22,975 claimed by each Debtor).[9] In a brief filed the following day, Debtors explained why they believed they qualified for federal exemptions under § 522(b)(3)(C). Doc. No. 379. More accurately, this appears to be a reference to the unnumbered "hanging paragraph" following § 522(b)(3)(C). *See generally in re Katseanes*, 2007 WL 2962637 (Bankr. D. Idaho Oct. 9, 2007).[10]

---

[8]  This was now a commission of $27,240 representing 6% of $454,000.

[9]  Exemption rights are established as of the petition date. Here, the chapter 11 petition was filed on October 17, 2011. The amount that can be exempted under § 522(d)(1) is subject to adjustment under § 104 on a three-year cycle. As of April 1, 2010, the amount was adjusted from $20,200 to $21,625. On April 1, 2013, that amount was adjusted from $21,625 to $22,975. If a § 522(d)(1) exemption were found to be valid, it would be limited to $21,625, and presumptively each Debtor could claim that amount. *See* § 522(m). The Court will therefore use a $43,250 figure in the following discussion.

[10]  For context, in the time from filing the chapter 11 petition in October 2011 through
(continued...)

MEMORANDUM OF DECISION - 7

Debtors also on January 30 objected to the sale to CPI. *See* Doc. No. 381.

Debtors argued that the sale of the Property to CPI would not "produce any assets

for the estate" given their newly asserted § 522(d)(1) exemption and given

Debtors' unadjudicated "administrative expense" claim under § 503(b)(1)(A)

based on their payments to Wells Fargo Bank and upkeep and repair of the

Property earlier in the chapter 11 and chapter 7 case.[11]

On the same day, Debtors filed a motion seeking abandonment of the

Property under § 554(b). Doc. No. 382. The motion to abandon is predicated on

the argument that the claimed, but as yet unestablished, exemption[12] and the

asserted, but as yet unadjudicated, administrative expense claim exhaust any value

---

[10] (...continued)

January 2015, Debtors consistently asserted Idaho exemptions, *see* § 552(b)(2) and Idaho Code § 11-609. They initially claimed a homestead exemption under Idaho Code § 55-1001, *et seq.*, on their property located in Post Falls, Idaho. Doc. No. 20 at 10 (sch. C). They also asserted they had not lived at an address other than the one in Post Falls in the three years immediately preceding the commencement of the case. *Id.* at 22 (SOFA ques. 15). In 2013, Debtors filed amended schedules and claimed an Idaho homestead exemption (of $1.00) in the Property in Arizona. Doc. No. 167 at 7. This drew an objection from a creditor, Doc. No. 177, that argued, among other things, that Idaho exemption statutes cannot be used to claim a homestead exemption on property located outside Idaho. *See Stephens v. Hopkins (In re Stephens)*, 2012 WL 3205362 (9th Cir. BAP Aug. 2, 2012). The objection was not resolved prior to conversion to chapter 7. Later in 2013, Debtors further amended their schedules, again claiming a homestead exemption under Idaho Code § 55-1001 in the Post Falls property. Doc. No. 253 at 13.

[11] Debtors' application for administrative expenses, Doc. No. 327, was filed on October 14, 2014. It alleges mortgage payments were made from October 2011 through March 2014 in an amount of $59,141.10; payment of property taxes, electricity, propane, lawn and swimming pool maintenance (etc.) which "on average" over 36 months totaled $47,700; and payment of $7,000 in repair of air conditioning equipment. Debtors alleged entitlement to a $113,841.10 claim under § 503(b)(1)(A). Trustee objected. Doc. No. 334. The application has now been set for hearing on March 31, 2015.

[12] Under Rule 4003(b)(1), Trustee has 30 days to object to the amended exemption claimed on January 29, 2015. That period will not run until March 2. *See* Rule 9006(a)(1).

MEMORANDUM OF DECISION - 8

in the Property for the benefit of the estate.[13]  This motion, however, lacked either notice of hearing or notice of opportunity for objection and hearing, *see* LBR 2002.2, and was not appropriately served consistent with LBR 6007.1.

On February 3, 2015, the Court held a hearing and considered the parties' arguments in light of the entirety of this record.  The Court orally overruled Debtors' objection, and granted Trustee's motion to approve the sale of the Property to CPI.

The ruling is a matter of record.  In sum, the Court noted that Trustee was under a duty under § 704 to expeditiously liquidate property of the estate having equity; that trustees were entitled to use their business judgment in determining how best to meet their statutory and fiduciary obligations; that courts should give appropriate deference to trustee's business judgment, though not absolute or uncritical deference; and that private sales of property of the estate were allowable and authorized alternatives to auction.  It found that Trustee disagreed with Debtors on what terms and conditions would be appropriate on a sale of the "equity" in the Property to them, and reasonably questioned Debtors' ability to perform.  Preferring the CPI sale was within Trustee's prerogative and justified on

---

[13]   The administrative expense, if allowed in some magnitude, is not a claim directly against the Property nor directly against the Property's proceeds.  Administrative expenses are paid from the funds of the estate under and in the order required by §§ 726(a) and (b).  If there are insufficient funds to pay them in full, they are paid pro rata, with allowed administrative expenses incurred in the chapter 7 case having priority over allowed § 503(b) expenses in the chapter 11 case.

MEMORANDUM OF DECISION - 9

his business judgment.  The Court noted there was no dispute that the CPI offer

provided fair market value and that Debtors conceded this point.

      The Court found that Trustee's proposed sale would result in monetizing

the asset, and the parties could thereafter litigate over the disposition of the

proceeds.  In that regard, it noted that after costs of sale (taxes, title, closing costs,

etc.), an amount could be reserved for potential compensation of the realtor on

application, notice and order.  And it observed that Trustee's compensation was

not payable from sale proceeds but instead calculated at the conclusion of the case

and paid from unencumbered assets.

      Further, it found that the newly-raised exemption issue was no reason to

disallow the sale, given the sufficient amounts to be received.  And the Court

observed that administrative expense, if allowed, was not something paid from

sale proceeds directly.

      Debtors' objections were therefore overruled and the sale approved.  The

Order, as noted, was entered on February 4.

**DISCUSSION AND DISPOSITION**

      The Court has taken some pains to explain the history and context of the

bankruptcy case and the specific litigation relative to Trustee's attempts to sell the

Property.  That is essential since the parties' arguments regarding a stay pending

appeal of the Order presume an awareness and appreciation of such details.

MEMORANDUM OF DECISION - 10

### A.    Stay on appeal under Rule 8007(a)(1)(A)

A request for a stay pending appeal of a bankruptcy court order or judgment is governed by Rule 8007.[14]  Among other things, Rule 8007(a)(1) requires that "[o]rdinarily, a party must move first in the bankruptcy court for [] relief."  The Rule thus recognizes the possibility of a subsequent request for a stay made to the district court or BAP if the appellant is unsuccessful at the trial court.  As discussed in *In re Pacifica Park Apts., LLC*, 2013 WL 787969 (E.D. Cal. Mar. 1, 2013), the appellate court will exercise its own discretion as to relief sought initially from it, but "in other instances (such as where the trial court has denied the stay) the appellate court simply determines whether the trial court abused its discretion."  *Id.* at *1 (quoting *In re Wymer*, 5 B.R. 802, 807 (9th Cir. BAP 1980), and citing *Universal Life Church v. United States*, 191 B.R. 433, 444 (E.D. Cal. 1995)); *see also Dynamic Finance Corp. v. Kipperman (In re North Plaza, LLC)*, 395 B.R. 113, 119 (S.D. Cal. 2008) (same).

Rule 8007(a)(1)(A) allows a party to request from the bankruptcy court a stay pending appeal, but does not address the basis on which such a ruling should be made.  The general authorities applicable to a request for a stay pending appeal were summarized in *Thomason Farms, Inc. v. Thomason (In re Thomason)*, 2007 WL 2257662 (Bankr. D. Idaho Aug. 3, 2007):

---

[14]  Up to December 1, 2014, Rule 8005 governed requests for a stay pending appeal.  The Court has not been presented with anything to suggest that, as relevant to the present dispute, the authorities relevant to former Rule 8005 are not similarly applicable to current Rule 8007.

"The standard for evaluating stays pending appeal is similar to that employed by district courts in deciding whether to grant a preliminary injunction." *Lopez v. Heckler*, 713 F.2d 1432, 1435 (9th Cir. 1983). In order to obtain a stay pending appeal, [movant/appellant] must demonstrate: 1) a likelihood of success on the merits; 2) irreparable injury if the stay is denied; 3) no substantial harm will come to [appellee]; and 4) that the stay will do no harm to the public interest. *In re Wymer*, 5 B.R. 802, 806 (9th Cir. BAP 1980). The appellant bears the burden of proving that all of these elements are satisfied in a particular case. *In re Irwin*, 338 B.R. 839, 843 (E.D. Cal. 2006) (quoting *In re Shenandoah Realty Partners, L.P.*, 248 B.R. 505, 510 (W.D. Va. 2000)). Failure to establish even one of the elements dooms the motion. *Id.* (quoting *In re Deep*, 288 B.R. 27, 30 (N.D.N.Y. 2003)).

*Id.* at *2 (footnote omitted). In *Lair v. Bullock*, 697 F.3d 1200 (9th Cir. 2012), the Ninth Circuit styled the four factors as "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." 697 F.3d at 1203 (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). *See also In re Mi Pueblo San Jose, Inc.*, 2014 WL 2219040 (Bankr. N.D. Cal. May 29, 2014); *accord Gibson v. Credit Suisse AG*, 2015 WL 105999 (D. Idaho Jan. 7, 2015) (applying same four factor analysis on motion for stay pending appeal of a sanctions order).[15] The movant seeking a stay pending appeal

---

[15]  Case law suggests a parallel between the standards for stay on appeal and requests for preliminary injunctive relief. The Ninth Circuit has explained that, after *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008), "The proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his

(continued...)

MEMORANDUM OF DECISION - 12

thus bears a heavy burden.  *In re General Motors Corp.*, 409 B.R. 24, 30 (Bankr.

S.D.N.Y. 2009) (citing *In re DJK Residential, LLC*, 2008 WL 650389 (S.D.N.Y.

Mar. 7, 2008)).

     As the Bankruptcy Appellate Panel noted, the power to grant a stay "should

be sparingly employed and reserved for the exceptional situation."  *Wymer*, 5 B.R.

at 806.  In *In re Jonas*, 2012 WL 2994724, at *2 (Bankr. D. Mont. July 23, 2012),

the court noted that "issuance of a stay pending appeal, like a preliminary

injunction, rests with the sound discretion of the trial court."

### 1.    Likelihood of success on appeal

     While there have been variable characterizations over the required showing,

the ultimate question for this Court is whether, and to what extent, Debtors have

shown a likelihood of success.  *See In re Woodcraft Studios, Inc.*, 2012 WL

160225 (N.D. Cal. Jan. 18, 2012) (requiring a strong showing); *North Plaza, LLC*,

395 B.R. at 121 (determining that "[s]howing a 'likelihood of success' requires

that the movant raise questions going to the merits [that are] so serious, substantial,

difficult and doubtful as to make them fair ground for litigation and thus for more

deliberate inquiry.") (citing *County of Alameda v. Weinberger*, 520 F.2d 344, 349

n.12 (9th Cir. 1975)).

     An appellant's likelihood of success on appeal depends in large part on the

---

[15] (...continued)
favor, and that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109,
1127 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20).

standard of review.  The standard of review on an appeal of an order approving a

sale is abuse of discretion.  *In re Lewis*, 515 B.R. 591, 594 (9th Cir. BAP 2014);

*Bonnett v. Gillespie (In re Irish Pub-Arrowhead, LLC)*, 2014 WL 486955 (9th Cir.

BAP Feb. 6, 2014); *Simantob v. Claims Prosecutor, LLC (In re Lahijani)*, 325

B.R. 282, 287 (9th Cir. BAP 2005).  "A bankruptcy court abuses its discretion if it

applies an incorrect legal standard, or misapplies the correct legal standard, or if its

factual findings are illogical, implausible or without support from evidence in the

record."  *Irish Pub-Arrowhead*, 2014 WL 486955, at *5 (citing *United States v.

Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc)); *see also Retz v. Samson

(In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010).

        Debtors argue that the Court's ruling on February 3 was inconsistent with

its prior ruling on November 4, and thus reflects misapplication of the appropriate

standards (or, in their later briefing, a perceived violation of "law of the case").

While the rulings were different, they are reconcilable, and this Court believes its

February 3 ruling meets the required standards.

        In November, the Court noted Trustee's duty to evaluate all options for

administering property, with an eye toward optimizing the value to the estate and,

thus, its creditors.  Though Debtors had appeared at the 11th hour and with little

firm supporting detail, the Court allowed them an opportunity to show Trustee

they could not only perform but provide the estate with a better return through

MEMORANDUM OF DECISION - 14

their purchase of the equity in the Property from the estate.[16]  But strict controls on that opportunity were imposed in order to prevent loss of the cash buyer while Debtors attempted to prove up their ability to perform.  The ruling was a balancing of Trustee's preferred approach to liquidating the property under § 704 and Debtors' argument that they should be afforded an opportunity to show they could provide a greater return to the estate.

But Debtors failed to meet the requirements that were imposed, as their counsel admitted at the hearing on December 1.  Instead, Debtors raised other "objections" and concerns about Trustee's suggested sale as a way of thwarting it.  The oppositions were overruled and the sale to the Mettilles approved.  Though this order was not appealed by Debtors, the sale to the Mettilles fell through.

Trustee once again found a buyer ready and qualified to close a cash sale of the Property, this time at $454,000.  That this is the full fair market value of the Property is a fact expressly conceded by Debtors.

Debtors raised many of the same sorts of objections and arguments in opposing the CPI sale as they did the Mettille sale.  In a different context, they could be seen as negotiating points in a give-and-take discussion between a seller

---

[16]   To be clear, debtors have no inherent or independently enforceable "right" to purchase unencumbered equity in estate assets, though trustees often evaluate that possibility, in their informed business judgment and discretion, as a means of appropriately liquidating property.  To the extent Debtors' arguments can be construed to suggest debtors have some sort of "right of first refusal" in sales of property of the estate, residential or otherwise, they failed to establish such a proposition.

MEMORANDUM OF DECISION - 15

and buyer over what price should be struck.  Here, however, they were voiced as somehow being proof that Trustee was not committed to getting the best return for the estate and its creditors, or that he was determined to prevent Debtors from being "bidders."  Trustee disputed these contentions.

But, importantly, the situation had changed.  Trustee had already lost one sale when Debtors argued for and were granted an opportunity to show Trustee they could provide greater value.  He was not required to ignore that experience, nor Debtors' ongoing conduct, in deciding how to approach the disposition of the Property a second time.  As the BAP stated:  "A trustee's selection of bidding and sale procedures is a matter committed to the trustee's business judgment, to which the bankruptcy court and this [Bankruptcy Appellate] Panel give deference."  *Irish Pub-Arrowhead*, 2014 WL 486955, at *10 (citing *Lahijani*, 325 B.R. at 288–89). Trustee adequately presented objective reasons why the private sale to CPI was superior, and why he harbored doubts about Debtors' proposals.

At bottom, what Debtors proposed (or suggested they might propose) was an alternative to the CPI sale in which Debtors would purchase the equity (subject to clarification of several figures and "disputes") that at the end would return to the estate an amount of approximately $2,000 more than was to be received from CPI.[17]  Trustee was understandably loath, given experience with the earlier sale

---

[17]  Debtors' objection contains a mathematical error.  Debtors assert the net proceeds of the CPI offer would be $44,837.40 instead of $43,837.40, thus resulting in a $1,085.10 difference between the parties' suggested net proceeds.  *See* Doc. No. 381 at 3.  The Court uses the $2,000

(continued...)

process, to embrace Debtors' alternative as capable of consummation. But he was also well within his business judgment in determining that the meager gain of $2,000 would not justify the loss of a willing, able and ready buyer and a consummated private sale at fair market value.

Debtors argue that the Court abdicated its "obligation in § 363(b) sales [] to assure that optimal value is realized by the estate under the circumstances." *Lahijani*, 325 B.R. at 288–89. As the BAP there noted: "[o]rdinarily, the position of the trustee is afforded deference, particularly where business judgment is entailed in the analysis or where there is no objection. Nevertheless, particularly in the face of opposition by creditors, the requirement of court approval means that the responsibility ultimately is the court's." *Id.*

The Court agrees it has such a responsibility. It thus observed and considered carefully the entirety of the sale process regarding the Property. Though Debtors' oppositions and arguments have at times shifted, and were raised at the 11th hour, all were closely evaluated.

When provided an opportunity to prove up their suggested alternative to the Mettille sale last fall, they failed to do so. Contrary to their protests now, that ruling did not establish that Trustee was obligated to hold an auction. It instead delayed his suggested and preferred private sale to allow Debtors an opportunity to prove up what they belatedly proposed.

---

[17](...continued)
"difference" based on the correct mathematical computation.

MEMORANDUM OF DECISION - 17

The oppositions to the CPI sale were similarly raised at the last minute. In part, they were based on a mistaken understanding, and thus argument, that the alleged administrative expenses would apply to directly reduce the proceeds of sale. And, in part, they were based on a newly-asserted claim of exemption that had not been claimed for the 3+ years Debtors have been in this bankruptcy. And, in part, they flow from Trustee's unnecessary reference in the sale proposals of his own potential § 326(a) compensation.

For clarity, after excluding the proposed administrative expense claim and Trustee's potential compensation, the competing proposals look like this:[18]

—Trustee would sell the Property to CPI for the sum of $454,000. After paying the lien of Wells Fargo Bank ($351,270.61) and escrow, title, taxes, dues and fees (a total of $5,751.99), a balance of $96,977.40 would remain. A commission of $27,240.00 would be reserved for payment to the realtor after proper application, notice and order. This would result in net proceeds of $69,737.40.

—Debtors would pay the estate $55,250.00 for the equity in the Property, and they would cure and assume the obligations to Wells Fargo Bank (and, implicitly, they would be responsible for real property taxes, dues, fees and the like), and their approach would avoid the various costs of closing (escrow and title charges) that a cash sale transaction would generate. They projected $3,315.00 for

---

[18]  The Court takes the information necessary for this comparative description from Trustee's notice of sale, Doc. No. 370, and from Debtors' objection, Doc. No. 381.

MEMORANDUM OF DECISION - 18

the realtor's compensation.[19]  This would result in net proceeds of $51,935.00.

Of course, these illustrations—properly, in the Court's view—exclude the potential administrative expense and Trustee's projected § 326(a) compensation, neither of which are paid directly from sale proceeds.  And, the Court observes, the net proceeds from a Trustee's sale of $69,737.40 would be more than sufficient to cover the exemption now claimed of $43,250.[20]

But were one to include Trustee's compensation—as Debtors and Trustee both did—then Trustee's sale would result in $43,837.40 in net proceeds, Doc. No. 370 at 3, and Debtors' proposal would result in $45,922.50 in net proceeds, Doc. No. 381 at 3.  On this basis, Debtors argued their approach would benefit the estate by an additional $2,085.10.

Trustee was entitled to reject the $2,085.10 benefit as unduly small given the risk of losing a pending cash sale at full market value, and the other unresolved issues with Debtors' renewed proposal.  More importantly, the Court, in its discretion and considered judgment, also rejected it.

Debtors contend that the Court ceded the decision to Trustee rather than exercising its own discretion.  The Court disagrees.  The decision to overrule the objection was in no sense a rubber-stamp for Trustee.  While the Court noted that Trustee's election to pursue the CPI sale and reject Debtors' still-developing

---

[19]  This represents a commission of 6% calculated on the $55,250.00 offered.

[20]  *See supra* note 9.  This is also relevant to the irreparable injury issue discussed below.

MEMORANDUM OF DECISION - 19

"offer" was within his reasonable business judgment, and that such business judgment merited deference (as *Irish Pub-Arrowhead* recognizes), the Court independently concluded the sale to CPI was proper and would promptly and optimally realize value from the asset. And, under all the circumstances, and given the manner of assertion, presentation and argument, that Debtors' proposal would ripen was suspect, and the "benefit" to the estate of the suggested "trumping" of CPI by $2,000 was de minimis if not ethereal.

The Court concludes Debtors have not shown a likelihood of success on appeal.

### 2.    Irreparable injury if stay denied

The second factor is that, in absence of a stay, irreparable injury to Debtors is likely. An appropriate starting point is to identify what is "irreparable." In its most basic sense, irreparable means "incapable of being rectified, restored, remedied, cured, regained or repaired[.]" Black's Law Dictionary 958 (10th ed. 2014). That resource further defines "irreparable injury" as "[a]n injury that cannot be adequately measured or compensated by money and is therefore often considered remediable by injunction." *Id.* at 906.

Debtors clearly have rights to the exempt portions of proceeds of property of the estate. But they do not have, by virtue of an exemption, rights to the unencumbered value of such property in excess of the exemption amount. Nor do they have trumping rights to be the purchasers of the property of the estate because

MEMORANDUM OF DECISION - 20

of prior prebankruptcy ownership of property or because of an exemption. *See*, *e.g.*, *Klein v. Chappell (In re Chappell)*, 373 B.R. 73, 77–82 (9th Cir. BAP 2007) (discussing extent of debtor's interest under a federal homestead exemption, and noting that it does not extend to the entirety of the residential real property, stating *inter alia* "the debtor's property remains property of the estate to the extent its value exceeds the statutory amount which the debtor is permitted to exempt.") (citations omitted).

If the CPI sale closes due to the absence of a stay, it is self-evident that Debtors will not be able to re-acquire the Property. But they have no per se right to acquire the Property even if it, at one time, was their residence. Their interest in the Property, through the alleged exemption, is here adequately assured by receipt of sale funds in excess of the exemption amount. Debtors have no other cognizable legal interest in the Property. In so concluding, the Court does not gainsay the loss of what was once a family home. But the simple fact of bankruptcy is that homes, if of a value exceeding secured debt and exemptions, are often sold by trustees.

While there could be arguments that Debtors suffer an "injury" from an unstayed sale of the Property, as counsel emotionally attempted to convey at hearing on this Motion, it is belied by the prospective money available to pay the

MEMORANDUM OF DECISION - 21

exemption (if allowed) and otherwise is not shown to be an "irreparable injury"
within the sense of the authorities.  The Court does not find that this factor is
established.

### 3.    Substantial harm to appellee if stay imposed

Though Debtors have failed to establish either of the first two elements, the
Court will address the others for completeness.  In connection with the third factor,
the Court must analyze if substantial harm will come to the appellee if a stay is
imposed.  The appellee Trustee is a fiduciary of all the creditors of Debtors'
bankruptcy estate.  Imposing a stay will result in potential harm and prejudice to
the creditors of the estate due to the delay in administration of the estate, and the
potential for loss of the sale to CPI.  A stayed sale will also expose the estate to
additional costs to secure and maintain the Property for the duration of the appeal.
An unserviced secured claim, and ongoing tax obligations, also diminish value.
While the Property is valued higher than what Debtors estimated at filing in 2011,
there is obviously no guarantee that the market will not move the other direction.

The Court finds that because closing the present sale is in the best interests
of the estate and its creditors, and that if stayed there would be a risk of loss of that
sale as well as additional expenses incurred by the estate pending resolution of the
appeal, substantial harm will come to Trustee and the bankruptcy estate he

MEMORANDUM OF DECISION - 22

represents if a stay is imposed.  This factor thus weighs against Debtors' Motion.[21]

### 4.    Public Interest

Finally, as to the fourth factor, the Court concludes public interest is not especially implicated by the dispute between Debtors and Trustee.  To the extent it is, imposition of a stay on appeal retards the legitimate public interest in seeing the bankruptcy process not just run its course but to do so with due speed.  Assets should be promptly gathered and administered and creditors paid.  Congress intended a deliberate and orderly process, and charged trustees with the duty to "collect and reduce to money the property of the estate . . . as expeditiously as is compatible with the best interest of parties in interest."  *See* § 704(a)(1).  Staying the order of sale does not serve that interest.

There is also public interest in due process.  Debtors have been afforded the opportunity to have their objections heard and evaluated by the Court.  They were given one prior opportunity to prove up their alternative proposal and failed to do

---

[21]  Debtors suggested posting (in some fashion) their proposed purchase price as a bond, and agreed to pay a monthly amount to cover accruing defaults to Wells Fargo Bank and maintenance costs as a means of ameliorating harm to the estate.  Amended Motion, Doc. No. 399 at 13.  This might relate to the issues of expenses incurred during an appeal, though it inadequately addresses potential negative changes in the market and/or possible loss of the CPI sale.  However, posting a bond does not guarantee a stay (outside of a supersedeas bond on appeal of a money judgment under Rule 7062 which incorporates Civil Rule 62(d) in adversary proceedings, a situation not present here).  Because the Court finds that no right to a stay has been established under the likelihood of success and irreparable injury factors, and it concludes it will not impose a stay, the need to address protection of the appellee under this third factor is effectively moot.

MEMORANDUM OF DECISION - 23

so.  The denial of a second opportunity, and the overruling of their objections, followed full consideration of their written submissions and oral argument.  While disappointed in the outcome, Debtors were afforded due process.

Though this factor of "public interest" is not significantly implicated in the present case, it does not tilt toward the imposition of stay.

**CONCLUSION**

The factors that must be evaluated under controlling case law do not support imposition of a Rule 8007 stay.  Debtors have not met their burden, and the Motion will therefore be denied.  The temporary stay that was imposed by the Court on February 17, 2015, pending this Decision, will be lifted.  The Court will enter an Order accordingly.

DATED:  February 24, 2015



TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 24