# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

IN RE                                    )
                                         )        **Case No. 11-21337-TLM**
**MARTIN D. FRANTZ,**                    )
**CYNTHIA M. FRANTZ,**                   )
                                         )        **Chapter 7**
                          **Debtor.**    )
_____          )

## MEMORANDUM OF DECISION ON
## DEBTORS' MOTION TO DISMISS OR RECONVERT,
## AND DEBTORS' MOTION FOR RELIEF FROM STAY
_____

**BACKGROUND AND FACTS**[1]

The facts relevant to the pending matters are taken from the record before

the Court in this chapter 7[2] case and from the hearing on March 30–31, 2015.[3]

Three and a half years ago, in October 2011, Martin and Cynthia Frantz

_____

[1]  This Decision constitutes the Court's findings and conclusions.  Rules 7052, 9014.

[2]  Unless otherwise indicated, citations to statutory provisions are to the Bankruptcy Code, Title 11 U.S. Code, §§ 101–1532, and citations to the "Rules" are to the Federal Rules of Bankruptcy Procedure.

[3]  As expressly stated at that hearing, the Court takes judicial notice of its files and records under Fed. R. Evid. 201.  While generally taking notice of what was filed, and when, does not mean the contents of those filings necessarily have evidentiary weight, *see Credit Alliance Corp. v. Idaho Asphalt Supply, Inc. (In re Blumer)*, 95 B.R. 143, 146–47 (9th Cir. BAP 1988), a debtor's verified bankruptcy schedules and statements, when offered against the debtor, have evidentiary effect under Fed. R. Evid. 801(d).  *In re Vee Vinhnee*, 336 B.R. 437, 449 (9th Cir. BAP 2005); *Jordan v. Kroneberger (In re Jordan)*, 392 B.R. 428, 444 n.32 (Bankr. D. Idaho 2008) (same).

("Debtors"[4]) filed a voluntary petition under chapter 11 commencing this case.

Their statement of financial affairs ("SOFA") disclosed a 2010 state court

"contract action" pending between Debtors and Idaho Independent Bank ("IIB").

It is clear that IIB is Debtors' single largest creditor. IIB's claim arises from

Debtors' unsecured guaranties of an IIB loan to an entity in which Debtors held a

majority interest. At the time of the bankruptcy filing the lawsuit had been

pending for over a year. While discovery had commenced and mediation had

been attempted, no motions for summary judgment had been heard in that suit, and

no depositions had been taken. Testimony indicated Debtors filed for bankruptcy

the day before Martin Frantz' deposition was scheduled to occur.

In March 2012, on Debtors' and IIB's joint motion, the Court appointed

Ford Elsaesser, an experienced bankruptcy practitioner and a chapter 7 trustee, as

a "mediator" in the chapter 11. The Court subsequently approved the employment

of Maggie Lyons and her business, Resolve Financial Group ("Resolve"), to

analyze Debtors' financial activities and transactions. Doc. Nos. 82, 100.[5] The

application to employ Resolve asserted that Elsaesser believed no mediation could

---

[4] Debtors filed a joint petition under § 302, and their schedules indicate their assets are community property and their obligations to creditors are community debts. The Court, for ease of reference, will at times refer to "Debtors" in describing transactions and events though Cynthia Frantz did not testify at the March 2015 hearing and several of the documents refer solely to Martin Frantz.

[5] Documents filed in the bankruptcy case are referred to as "Doc. No." and those filed in the related adversary proceeding brought against Debtors by IIB, Adv. No. 13-07024-TLM, are referred to as "Adv. Doc. No."

MEMORANDUM OF DECISION - 2

successfully conclude until a financial professional thoroughly evaluated, analyzed and reported on "Debtors' transfers, finances, assets, liabilities, and businesses[.]" Doc. No. 82 at 2.

In February 2013, Elsaesser filed a status report that noted Resolve's "report" had been provided to him, Debtors, IIB and the United States Trustee ("UST") on January 10, 2013,[6] and that Debtors and IIB had agreed to a mediation session to occur in March 2013. On March 29, 2013, however, Debtors and IIB filed a joint motion for conversion of the case to chapter 7. Doc. Nos. 185, 187. The case was converted to a liquidation case under chapter 7 on April 23, 2013. Doc. No. 193.

IIB filed an adversary complaint on August 23, 2013, alleging causes of action under §§ 523(a)(2) and (a)(6). Adv. No. 13-07024-TLM.[7] IIB sought both a judgment for damages (in an amount not exceeding the full obligations due under the "Eagle Ridge Loan," the "Twin Lakes Construction Loan" and the "Line of Credit" as described therein) and a ruling that such damages, plus interest,

---

[6] A copy of the report was marked at the March 30 hearing as Ex. 212 but never offered. However, its contents were referred to by Martin Frantz in responding to questions from his own counsel, and in cross examination, and later referred to by the chapter 7 trustee, David Gardner ("Trustee"), in his testimony. The Court therefore allowed questioning of witnesses that related to the existence of the report and their actions taken in response, connection or regard to it, but it is not considered as evidence establishing the conclusions asserted therein.

[7] Throughout the case, Debtors and IIB entered into a series of stipulations extending the Rule 4007(b) deadline for filing an adversary proceeding contesting dischargeability of IIB's claim.

MEMORANDUM OF DECISION - 3

attorneys' fees and costs, were nondischargeable.  Adv. Doc. No. 1.[8]

In late September 2013, Debtors moved for an order requiring Trustee to abandon the "counterclaim" they allegedly had against IIB related to the matters asserted in or underlying the adversary proceeding.[9]  After Trustee objected, Debtors withdrew their abandonment request shortly before a scheduled evidentiary hearing on that matter.

As noted, administration of the chapter 7 case commenced in April 2013. After selling a number of personal property assets, Trustee sought turnover of Debtors' real property in Scottsdale, Arizona.  Ultimately, after months of litigation, Trustee was granted authority to sell this property.  The disputes involving this request, and Debtors' several alternative litigation strategies in objecting to Trustee's request and attempting to gain control of the Arizona real property, were described in detail in the Court's oral ruling approving sale and in a February 2015 decision denying Debtors' request for a stay pending appeal.  Doc.

---

[8]  Debtors have argued that the adversary proceeding only seeks a declaration of nondischargeability, and does not seek adjudication or liquidation of the debt to IIB.  That assertion is belied by the contents and prayer of the complaint, which seek a determination of the amount of nondischargeable debt.  The total amount of IIB's alleged debt is over $6.4 million. *See* Claim No. 6-1.  The Court also notes that IIB's claim, filed on January 30, 2012, has never been objected to and is thus allowed, *see* §§ 501, 502, and has prima facie evidentiary effect as to validity and amount, *see* Rule 3001(f).

[9]  This motion, Doc. No. 255, asserted that such a counterclaim against IIB had been asserted in state court litigation, and that Debtors had disclosed it on February and September 2013 amendments of schedule B.  This is an apparent reference to Ex. 204 at 5 and Ex. 206 at 4, both of which simply list an unliquidated claim in an "unknown" amount.  Debtors' briefing on this motion suggested a $3.1 million counterclaim.  Doc. No. 265.

MEMORANDUM OF DECISION - 4

No. 414.[10]  In addition, it was established at the March 30 hearing that Debtors

caused several *lis pendens* to be filed of record on the Arizona property *after* the

Court ruled.  The first such filing was removed following Trustee's protests.  The

second was removed after the Court entered an order compelling its removal.  That

was subsequently followed, however, with the filing of a third, post-sale closing,

*lis pendens*.

On February 27, 2015, just three days after the Court denied their motion

for a stay pending appeal, and with rescheduled trial in the IIB adversary looming

in May,[11] Debtors filed a Motion to Dismiss or Reconvert to Chapter 11, Doc. No.

421 (the "Dismissal/Reconversion Motion").  Debtors' Dismissal/Reconversion

Motion is terse, and simply states: "The grounds for this motion are that the

debtors want to pay all their creditors.  They desire to continue to litigate their

claim against Idaho Independent Bank.  Dismissal, or conversion of this case to

Chapter 11, is the best way to accomplish this goal."  The Dismssal/Reconversion

Motion was served on all creditors.  *Id.* at 2–5.[12]

---

[10]  The specific findings and conclusions in such rulings are incorporated by this reference and without repetition.

[11]  Trial had been set to commence on December 1, 2014.  Debtors attempted in several ways to delay commencement of the trial, including motions to continue and motions to disqualify IIB's counsel and several of IIB's disclosed witnesses.  The Court ultimately denied all such requests, though the hearings on the latter did delay the trial date, which is now set for May 26, 2015.  *See* Adv. Doc. Nos. 51 (minute entry denying motion to continue), 71 (minute entry), 105 (transcript of 12/10/14 oral ruling).

[12]  Debtors also filed a brief in support of the Dismissal/Reconversion Motion and served
(continued...)

An hour and a half after filing their Dismissal/Reconversion Motion, Debtors filed a Motion for Relief from Stay, Doc. No. 425 (the "Stay Relief Motion").  The Stay Relief Motion seeks relief "for the purpose of determining [in state court] the amount, if any, the Frantzes owe putative creditor Idaho Independent Bank[.]"  Debtors specifically disclaim any desire to pursue their counterclaim, and only seek relief to assert "their defenses and affirmative defenses" to IIB's claim.[13]

At a hearing on March 3, the Court identified a March 30 hearing date for Debtors' two motions and set pre-hearing evidentiary disclosure deadlines.  Under Rule 2002(a)(4), a hearing on dismissal or conversion of a chapter 7 case (with exceptions not relevant here) requires 21 days' notice to all creditors and parties in interest.  The date selected by the Court for hearing allowed Debtors to issue a notice of hearing on proper notice.  Debtors never provided a notice of hearing to creditors.  Nevertheless, the Dismissal/Reconversion Motion and the Stay Relief Motion came on for hearing on March 30, 2015.  The Court has considered all the

---

[12] (...continued)
it on creditors and parties in interest.  *See* Doc. No. 422 at 5, 9–11.

[13]  For additional context, just prior to these two motions, on February 12, 2015, Debtors filed a "waiver of discharge" and a motion to approve that waiver.  Doc. Nos. 397, 398.  The waiver expressly excluded the debt to IIB and was thus a "partial" waiver.  The Court, at hearing on March 3, found that § 727(a)(10) provides for only a complete, not a selective or partial, waiver of discharge, and it denied Debtors' motion.  *See Kartzman v. Kleinmann (In re Kleinmann)*, 2010 WL 1641085 (Bankr. D.N.J. Apr. 21, 2010).

MEMORANDUM OF DECISION - 6

testimony presented[14] and the documentary evidence admitted.

In many ways, the motions could be resolved on the basis of the record alone, but over the course of the two day hearing, the parties specifically raised and established a number of facts, some of which the Court highlights below.

## I.

Debtors made serial amendments to their schedules and statements throughout the case.  The clear weight of the evidence was that all such amendments were triggered by Debtors' undisclosed or inadequately explained assets and transactions, as identified in the Resolve report, or were in response to the questions and objections raised by creditors, the UST and Trustee.  In short, Debtors' amendments were not independently initiated or proactive.

When such issues came to light, Frantz said he would advise his attorneys[15] of what needed to be changed, added or deleted.  He would later receive signature pages to sign regarding the amendments, but he did not necessarily review the amendments or verify their accuracy when executing the verifications.

## II.

In October 2010, approximately a year before the bankruptcy filing and several months after the start of the IIB state court suit, Martin Frantz settled a

---

[14]  The Court has also considered the credibility of all witnesses and the weight to be given their testimony, whether emphasized in this Decision or not.

[15]  Debtors have had four separate attorneys in the bankruptcy case.

MEMORANDUM OF DECISION - 7

promissory note in the face amount of $1,050,000 owed to Debtors by their son,

Tyson Frantz, and his wife, Melissa.  Ex. 222.[16]  On the original SOFA, this was

disclosed as a "sale" of a note to Tyson for "an equivalent interest in [the Frantz

Family Investment Group, LLC or "FIG"] and $110,000.00" and that this was "in

the ordinary course of business."  Ex. 202 at 21.  Testimony indicated it was a

settlement of the obligation owed to Debtors, not a sale of the note.[17]  Debtors later

"explained" to Resolve that they accepted a 19% interest in FIG and cash in

satisfaction of the note.  *See* Ex. 223.

As part of this settlement agreement, the parties amended the FIG operating

agreement to entitle Debtors to a "priority distribution of $50,000 annually prior to

any other distributions."  Ex. 224.  The distributions were to start 5 years later

(*i.e.*, in 2015) with any portion of the payments not made being added to future

payments "until paid in full."

Martin Frantz testified he could not recall the amount due on the note.  The

amortization schedule attached to the note, however, shows total payments of

$52,420 and a balance due of $1,066,316.34 as of March 2007.  Given this

---

[16]  The May 2006 note was secured by the borrowers' LLC interests in Snow Peak 1 Real
Estate Holding Co., LLC, which interests were acquired by the proceeds of the loan.  The note
was payable monthly starting in June 2006.  For the first year interest accrued at 8% and
thereafter at Wells Fargo Prime plus 1%.  The obligation was subject to a balloon payment in
June 2016.  An attached amortization indicates payments defaulted within the first year.

[17]  Martin Frantz testified that referring to the settlement as a "sale" in the SOFA was due
to his dyslexia.

MEMORANDUM OF DECISION - 8

balance, and since there is no absolute amount noted in the settlement agreement, it appears the $50,000 payments will exist for an extended period.

Martin Frantz admitted that the right to this income stream was an asset of the bankruptcy estate and is subject to Trustee's administration. The right to these payments has never been disclosed in any schedule B. Though the separate FIG ownership interest was scheduled, the details varied significantly.[18]

### III.

In the January 2012 MOR, Debtors disclosed receipt of $89,619.89 as management or partner fees, with a notation of "GP FEE INCOME AMMON ASSOC." Ex. 228. A settlement statement on this transaction regarding Ammon Associates, Ex. 121, indicates Martin Frantz was paid an "exit fee" of $65,250.00 and a $24,369.89 repayment of a "loan" he had made to the entity.

Debtors' 1% partnership interest in Ammon Associates was disclosed elsewhere in this MOR as worth $80,000. Subsequent MORs failed to reference an ownership interest in Ammon Associates. *See* Ex. 229. Hand-written notes on the settlement statement, Ex. 121, suggest the "exit fee" was paid for services rendered, and that nothing was paid "for" Frantz' general partner interest because

---

[18] Debtors' ownership interest in FIG was disclosed on schedule B but it was aggregated with all other partnership interests. *See* Ex. 202. Reference to FIG was deleted in a later amendment, Ex. 204. A reference to a 5.38% interest (not 19%) in FIG with a value of "$0" was disclosed in a subsequent amendment, Ex. 206. However, in certain of the chapter 11 monthly operating reports ("MOR"), a 5% interest in FIG was shown as worth $260,000. *See*, *e.g.*, Ex. 229.

MEMORANDUM OF DECISION - 9

all proceeds under the agreement (net of taxes, secured creditors and closing) had to be first paid to limited partners.  The post-bankruptcy "sale" and satisfaction or termination of the general partner interest were not disclosed to or approved by the Court.[19]

Martin Frantz testified that he had made loans to at least two partnerships during the chapter 11 portion of the bankruptcy, including Ammon Associates, saying this occurred when "I had to feed the partnership."  The loans and the fact that these partnerships owed money to Debtors (in addition to Debtors' ownership of general partner interests) were not disclosed.  Nor did Debtors disclose the fact that the amounts paid in January 2012 included repayment to Debtors of an Ammon Associates loan.[20]

IV.

In October 2012, Debtors attempted to sell rights flowing from their partnership interests in entities controlling 21 affordable housing projects.  Doc. No. 127.  The sale contemplated that 50% of the general partner's interest in fees, and 50% of its interest in profits, would be sold to Tailored Management Services,

---

[19]  Martin Frantz appeared to argue, though unpersuasively, that if creditors would have no right under a partnership agreement to object to a sale, then they would have no right to object if it were sold in bankruptcy and thus that no disclosure of such a sale during bankruptcy would be required.

[20]  Frantz argued that wherever there were omitted details of this sort, creditors could get the rest of the information from the Resolve "audit."  Not only was the Resolve report not filed with the Court until Debtors filed it in the adversary proceeding in November 2014, *see* Adv. Doc. No. 64-1, but Debtors cannot rely on whatever information Resolve compiled from its investigation to justify Debtors' violation of their duty of full, candid and complete disclosure.

LLC for $40,000, netting $30,000 to the estate after taxes.  The motion did not

fully and candidly disclose that the buyer entity was owned by one of Debtors'

sons.  There were also issues concerning the reasonableness of the sales price

when evaluated in relation to partnership finances and cash flow.  The motion thus

drew objections from IIB and the UST, and it was denied in December 2012 after

hearing.

V.

Debtors' interest in Admiralty Associates was sold during the chapter 11.[21]

Franz testified that the sale was directed by and through his brother, Jim Frantz,

who had replaced him (or "taken over" for him) as general partner.  Debtors were

entitled to approximately $92,000 from that transaction, which was paid at or

about the time of the conversion to chapter 7 on April 23, 2013.[22]  Those funds

were not paid to Debtors but, instead, were paid directly to the IRS on Debtors'

behalf, referencing Martin Frantz' Social Security number.  Jim Frantz later

explained to Trustee that the direct payment was to protect the partnership from

IRS inquiries.

The sale or satisfaction of Debtors' interest in this partnership was not

disclosed during the chapter 11, nor approved by the Court.  Nor was the payment

---

[21]  This was a general partner interest in what was otherwise disclosed in Debtors'
schedules as a "Sitka" partnership with a value for such interest of $4,300.

[22]  The stipulated motion to convert had been filed about a month earlier.

MEMORANDUM OF DECISION - 11

of Debtors' IRS obligation disclosed.[23]

## VI.

The amended final report and account following conversion, Doc. No. 225, reflects total chapter 11 income of $306,634.44, most of which was allegedly from "management employment fees." Yet only slightly over $20,000 remained and was provided to Trustee at conversion.

The expenditures during the chapter 11 are not itemized in the final report but Debtors refer generally to the MORs they filed during the chapter 11 for that information. *Id.* The detail in the MORs, Exs. 225–239, are summarized in the final April 2013 MOR included as part of Ex. 239. That MOR reflects that, over the 18 month duration of the chapter 11, total income of $384,761.05 was realized and expenditures totaled $369,939.24. Those expenditures included $160,669.40 in personal living expenses.[24] Debtors have a two-person household and claimed no dependents in their filings. However, they have argued they at times supported many of their 14 adult children and spouses and 24 grandchildren. *See* Ex. 246. These living expenses constitute 43% of all expenditures and average slightly over

---

[23] Frantz testified that he may also have been entitled to repayment of a loan made to this partnership, but could not recall if it had been paid.

[24] The Court's review of the specific monthly entries in this category on each of the MORs suggests the amount shown on the summary in the last MOR may not be accurate, but the Court's calculations would suggest the actual amount is even higher.

MEMORANDUM OF DECISION - 12

$8,900 per month, not including a mortgage expense that is separately itemized.[25]

These same MORs reflect that through the course of the chapter 11, Debtors made $19,000 in "capital contributions" to Eagle Ridge on Twin Lakes, Inc. ("ERTL"), one of Debtors' corporations engaged in a north Idaho real estate development. *See* Exs. 225, 227 at 5. And they made another $10,000 capital contribution to ERTL in March 2012. *See* Ex. 230. Debtors also made loans to ERTL of at least $41,500. *See* Ex. 231 ($10,000), Ex. 236 ($8,000), Ex. 239 ($7,000 in January 2013, $5,000 in February 2013, $5,000 in March 2013, and $6,500 in April 2013). No request to use estate funds to make such contributions or loans, *see* § 363(b)(1), was ever made or approved.[26]

During the chapter 11 when funds were being infused into ERTL, Debtors' filings suggested their interest in the corporation had value.[27] ERTL owns 104 acres of real estate in north Idaho, adjacent to 50 acres owned by Debtors. Debtors' initial Rule 2015.3 report, Doc. No. 24, was filed in November 2011 and

---

[25]    The MORs show several months where the non-mortgage living expenses exceeded $10,000. *See* Ex. 229 ($11,088); Ex. 230 ($11,265); Ex. 232 ($14,239); Ex. 233 ($22,528); Ex. 235 ($10,308); Ex. 237 ($13,790); Ex. 238 ($10,328); Ex. 239 ($16,074 in January 2013).

[26]    In a letter to IIB's counsel, Debtors argued that ERTL's monthly expenses of $3,935.36 (which included payment of Debtors' health insurance) were paid as "ordinary course of business" expenses. This argument was never raised to the Court, whether in regard to those monthly expenses or the loans or capital contributions to ERTL.

[27]    *See*, *e.g.*, Ex. 225 (MOR Oct. 2011, indicating an 87.99% interest worth $870,000). The MORs continued this assertion until August 2012 when the same percentage ownership was shown to be worth $720,000. Ex. 234. This latter valuation stayed constant through conversion. Ex. 239.

MEMORANDUM OF DECISION - 13

ascribed, consistent with the earlier MORs, a $870,000 value to Debtors' interest

in ERTL.  A supplement (addenda) to the Rule 2015.3 report, Doc. No. 47,

addresses ERTL and provides Debtors' opinion of the then-present value of the

104 encumbered acres as $5.52 million.  Debtors subtracted an IIB secured claim

of $4.6 million (an amount that excluded default interest and penalties) and thus

calculated a $920,000 value for their interest in ERTL.[28]

However, IIB's proof of claim (on Debtors' guarantee of the ERTL secured

obligation to IIB) is filed in excess of $6 million.[29]  This indicates Debtors had and

have negative equity in ERTL.  Their infusion of cash into ERTL in the form of

loans and capital contributions, in addition to funding operating expenses, during

the chapter 11, was not shown to be appropriate or justified.

While there were a number of other matters explored at length at the

hearing, the Court deems it unnecessary to make findings as to all such matters.

The foregoing, and the Court's record, suffice for purposes of this Decision.

Debtors' Dismissal/Reconversion Motion was objected to by the UST,

Trustee, IIB and creditors Dirk and Ann Roeller.  The Stay Relief Motion was

opposed by IIB.  All issues were taken under advisement on March 31 following

---

[28]  The reason for the difference between this $920,000 value and the $870,000 assertion
is not clear.

[29]  That claim indicates principal and non-default interest on loan no. 1309 is
approximately $4,672,000.  Default interest, late charges and other expenses increase the balance
of that loan to $6,084,000.  The claim also includes a separate personal loan (no. 1328) of about
$334,000.

MEMORANDUM OF DECISION - 14

argument. The Court has evaluated the dockets and record, the evidence, the

arguments of the parties, and the applicable authorities. It concludes that Debtors'

motions must be denied.

**DISCUSSION AND DISPOSITION**

      **A.**     **Dismissal/Reconversion Motion**

     Debtors' Dismissal/Reconversion Motion seeks inconsistent and, thus,

alternative forms of relief, which will be separately addressed.

      **1.**     **Dismissal**

     A chapter 7 debtor's motion to dismiss the case is considered under

§ 707(a), which states:

> (a) The court may dismiss a case under this chapter only after notice
> and a hearing and only for cause, including—
>> (1) unreasonable delay by the debtor that is prejudicial to
>> creditors;
>> (2) nonpayment of any fees or charges required under chapter
>> 123 of title 28; and
>> (3) failure of the debtor in a voluntary case to file, within fifteen
>> days or such additional time as the court may allow after the
>> filing of the petition commencing such case, the information
>> required by paragraph (1) of section 521(a), but only on a
>> motion by the United States trustee.[30]

     As stated by the Bankruptcy Appellate Panel in *Galloway v. Ford (In re*

*Galloway)*, 2014 WL 4212621, at *5 (9th Cir. BAP Aug. 27, 2014):

>      Dismissal of a chapter 7 case is governed by § 707(a): "The

---

[30]  The term "including" found in § 707(a) makes the three examples of cause illustrative
and not exclusive. *Neary v. Padilla (In re Padilla)*, 222 F.3d 1184, 1191 (9th Cir. 2000) (citing
§ 102(3)).

MEMORANDUM OF DECISION - 15

court may dismiss a case under this chapter only after notice and a
hearing and only for cause[.]" *In re Bartee*, 317 B.R. [362,] 365 [(9th
Cir. BAP 2004)]. Debtors do not have an absolute right to dismiss their
voluntary chapter 7 case. *Id.* Like any interested party, under § 707(a),
a debtor must prove by a preponderance of the evidence that "cause"
exists to justify dismissal of a chapter 7 case. *In re Leach*, 130 B.R.
855, 856 (9th Cir. BAP 1991). Further, dismissal should only be
granted if there will be no harm to creditors. *In re Bartee*, 317 B.R. at
365; *Gill v. Hall (In re Hall)*, 15 B.R. 913, 917 (9th Cir. BAP 1981)
(citing *Schroeder v. Int'l Airport Inn P'ship*, 517 F.2d 510, 512 (9th
Cir. 1975)).

*Bartee* further notes that debtors have the burden of proving that dismissal will

cause no legal prejudice to interested parties. 317 B.R. at 366 (citing *Leach*, 130

B.R. at 857). *Bartee* was an asset case, and the BAP found that dismissal would

have prejudiced creditors because there was no guarantee the debtors would pay

their debts outside of bankruptcy. The BAP agreed with the bankruptcy court that

debtors' proposals were too speculative to establish the required lack of prejudice.

*Id. Galloway* echoed this proposition: "A debtor's speculative ability to repay

creditors outside bankruptcy is not cause for dismissal." 2014 WL 4212621 at *6

(citing *Turpen v. Eide (In re Turpen)*, 244 B.R. 431, 434–35 (8th Cir. BAP 2000)).

### a.   Debtors' asserted cause and lack of prejudice are unpersuasive

Debtors argue creditors will not be prejudiced by the dismissal of the case,

and they can provide more to their creditors outside bankruptcy by returning to

their prebankruptcy business as compared to what a chapter 7 trustee could

provide through liquidation.

Martin Frantz' prebankruptcy business involved the development of

MEMORANDUM OF DECISION - 16

numerous affordable housing projects.  The projects were generally owned by single-purpose limited partnerships, in which Debtors held a general partner interest.  Income to Debtors flowed not only from such ownership interests but from compensation for the development of the projects and their management.

Such projects benefit from various types of governmental incentives including subsidized loans and tax credits.  The nature of such projects and credits provides opportunities for value to be obtained through "resyndication" and refinancing of projects and the restructuring of underlying partnerships.  These processes also involve sales of tax credits, which are dependent on the project, the market, and the discounted value of such credits.  Some project transactions also involve "rehabbing" which requires remodeling of the physical projects for purposes of such sale or resyndication.

The existence of Debtors' bankruptcy imposes a significant impediment to this business.  Martin Frantz' bankruptcy apparently violates the covenants of the project partnerships and syndication agreements, and perhaps regulatory requirements.  He testified that, practically speaking, the presence of his bankruptcy prohibits sales and resyndications so long as he personally is involved.  He indicated that even a completed bankruptcy with a discharge would disqualify him from participating in government-assisted affordable housing contracts and related syndications.

The dismissal of the case, in Debtors' view, would solve this bankruptcy

MEMORANDUM OF DECISION - 17

problem or obstacle.[31]  Debtors claim dismissal would allow them to extract value

from the projects over a 3 to 5 year time frame, and that value would be used to

pay creditors.  Debtors assert this approach would generate significantly more than

the bankruptcy liquidation of their general partner interests in the numerous

limited partnerships.[32]

Debtors argue that future payments to creditors outside bankruptcy will be

assured by a mortgage on 50 acres owned by Debtors.[33]  A draft proposed

mortgage was admitted as Ex. 165.  It contains numerous blanks and is clearly just

a working document.  The exhibit also contains "primary points" providing some

very general terms of Debtors' plan to pay creditors after dismissal.  Neither the

draft mortgage document, nor the "points" explaining the post-dismissal plan

terms, were provided to creditors, though there was a general reference to Debtors

"grant[ing] equal priority liens on his 50 acres to all creditors except [IIB]" in the

brief accompanying their Dismissal/Reconversion Motion, Doc. No. 422.[34]

---

[31]  However, Frantz seemed to suggest that even if the bankruptcy were to be dismissed, unresolved litigation with IIB would prohibit him from qualifying for government-assisted financing, though perhaps other partners in the projects could qualify.

[32]  The asserted value of the general partnership interests *per se* was subject to wide variation by Debtors.  *See* Ex. Nos. 202, 204, 206.  When asked by Trustee's counsel what justified those changes in value, Martin Frantz could not provide an answer.  As noted, Debtors' attempted sale of interests in one such limited partnership to their son's company, Tailored Management, was for substantially less than the various values Debtors had asserted in the bankruptcy.  Frantz also admitted he had valued such interests at substantially higher amounts in prior financial statements, but justified the later, lower values as a result of "regulatory changes."

[33]  Debtors assert this property is worth $2.6 million.

[34]  Trustee identified the 50 acres (along with potential litigation recoveries against
(continued...)

MEMORANDUM OF DECISION - 18

Debtors' arguments regarding lack of prejudice are also based to a degree on their allegation that the 50 acres, and the adjacent ERTL property, can benefit from "conservation easements" which could be worth significant amounts. The prebankruptcy possibility of such an easement was reflected in a July 2006 letter, Ex. 150. However, this proposal required payment by Debtors or their corporate entity of $40,000 (the first portion of which was due by December 2006) and recordation of the easement. These conditions were never fulfilled. Issues with establishing or settling lot lines on the property prohibited closing that transaction. Nothing other than Frantz' assurances was provided to establish that similar easements could be obtained to the benefit of the property at this date.

Thus, Debtors argue that creditors will not be prejudiced by dismissal because they will be paid their claims outside bankruptcy and because they will have the security of the mortgage on the 50 acres. But Debtors did not establish either the ability to generate funds for payment, or that their conceptual mortgage would effectively secure creditors.

Moreover, Debtors specifically exclude IIB from the security of that mortgage. They argue that even though IIB is their largest creditor, it has a

---

[34] (...continued)
various Frantz' family members and related entities and Debtors' interests in the rural development/affordable housing projects and partnerships) as one of the most valuable assets of the estate. However, Trustee would presumptively liquidate the property and pay creditors the proceeds. From the creditors' perspective, this approach differs significantly from using the property as security for future payment. Debtors did not effectively address the difficulties inherent in a "group" mortgage of the type proposed or the additional time and expense for creditors in exercising rights under such a mortgage.

MEMORANDUM OF DECISION - 19

"disputed" debt and, therefore, will not receive the same treatment as other creditors upon dismissal and it will not be secured by the mortgage.  *See* Doc. No. 422 (brief); *see also* Ex. 165.  In addition, during examination, Martin Frantz admitted that other creditors (the Roellers, and Michael Reagan) were or might be "disputed" as well.  This "exclusion" of other non-IIB creditors from the proposed treatment and mortgage was not disclosed in the motion or brief.

Another aspect of Debtors' request to dismiss suggests that creditors are "guaranteed" eventual payment given Debtors' "waiver of discharge."  To the extent this is a reference to Debtors' prior motion to waive discharge, Doc. No. 398, the Court previously denied that motion, as it improperly contemplated only a "partial" waiver.

At the March 30 hearing, Debtors again argued they would couple the dismissal with a "discharge waiver."  But whether it would apply to all creditors, and how, was decidedly unclear.  More significantly, though, Debtors could not explain how a "waiver of discharge" would apply should dismissal be granted.  A dismissal ruling at this time would moot the question of a bankruptcy discharge.[35]  After extended discussion at hearing, it appeared that Debtors might be suggesting a dismissal with "prejudice" in the sense of a bar of discharge in any later bankruptcy case of debts dischargeable in the dismissed case.  *See* § 349(a).

---

[35]  No discharge has yet been entered in this case.

MEMORANDUM OF DECISION - 20

Debtors never made their precise proposal clear at hearing and, importantly, they did not make it clear to creditors in their pleadings.[36]

Finally, Debtors' proposal makes no provision for payment upon dismissal of the case for the administrative expenses that have accrued in both the chapter 11 and the chapter 7 components of this 3½ year proceeding.

In summary, while testimony indicated that Martin Frantz had historically high income generating capability through the development of subsidized affordable housing projects, the proposition that he could effectively re-engage in that field to the same extent was not proven. The security to be provided creditors in return for dismissal was sketchy and undeveloped. Creditors were not provided adequate detail concerning the proposals, including identifying all the creditors "excluded" from such protection. The suggestion of a "waiver" (or "bar") of discharge was not adequately explained, and Debtors' theory of "partial" waiver had already been rejected. And the notice to creditors of the details of the proposal, and notice of hearing, was patently inadequate.

Debtors have also argued in support of dismissal that they now feel it was a

---

[36] In closing arguments, Debtors appeared to indicate that, if the Court thought the conditions or terms they suggested at hearing (at times called Debtors' "plan") were or could be acceptable, creditors could later receive notice of those terms. It was not clear whether that argument related to dismissal as well as reconversion but, in any event, it ignores the requirement of proper *prior* notice to creditors.

MEMORANDUM OF DECISION - 21

mistake to file the voluntary chapter 11 petition (in 2011), and to convert to

chapter 7 (in 2013), and part of the reason for the mistake was the inadequate

advice of counsel.  Assertions of bad legal advice as "cause" for dismissal were

discussed in *Bartee*, *see* 317 B.R. at 364, and *Leach*, *see* 130 B.R. at 856 and

857–58, and were unavailing.[37]  And, here, the evidence before the Court does not

support the contention.  The strategy of filing bankruptcy to deal with

creditors—primarily IIB—was intentional, as was the decision to convert.  *See*

Doc. No. 401 (declaration of Martin Frantz in support of waiver of discharge).

That it is now regretted is not cause for dismissal.

And these arguments come long after the decision to file bankruptcy, and

long after the decision to convert.  Debtors filed a chapter 11 case in 2011,

assuming the duties and burdens of debtors in possession, and remained in that

case and in control of the property of the estate (but without proposing a plan) for

just shy of 1½ years.  They then stipulated to conversion to chapter 7 where they

have remained for 2 years.  Creditors have been stayed throughout this process,

---

[37]  Similarly, in *In re Guth*, 2002 WL 31941460 (Bankr. D. Idaho Nov. 8, 2002), the debtors contended that meetings with attorneys left them with the understanding they could file a "single-creditor, single-asset" case to halt a foreclosure.  Debtors later sought to dismiss the case on several grounds, including alleged bad legal advice, or their mistake in understanding or relying on such advice.  The Court, *id.* at *7, addressed the authorities, and the arguments including debtors' alleged "error" in filing, and denied the request to dismiss under § 707(a).  It found, *inter alia* and apropos to the instant case, that debtors (i) intentionally sought bankruptcy relief, intending to use the filing to deal with a difficult creditor; (ii) availed themselves of legal advice; and (iii) were not unsophisticated.

MEMORANDUM OF DECISION - 22

and none have been paid on their claims.  *See, e.g.*, *Turpen*, 244 B.R. at 435

(creditors can incur prejudice if the motion to dismiss is brought after the passage

of considerable time); *In re Jauregui*, 2013 WL 1249026, at *7 (Bankr. C.D. Cal.

Mar. 27, 2013) (finding debtor failed to establish cause to dismiss in a case that

had been pending nearly four years); *In re Klein*, 39 B.R. 530, 533 (Bankr.

E.D.N.Y. 1984) (discussing prejudice from delay, whether caused by inadvertence

or design).  The delay in raising the argument is significant and prejudicial.

The burden, in all regards, was on Debtors, and they established neither

good cause for dismissal nor the absence of prejudice.  Debtors' request for

dismissal will be denied.

### 2.      Reconversion to chapter 11

Conversions of chapter 7 cases fall under § 706 of the Code.  Under

§ 706(a), a debtor may convert the case to one under chapter 11, 12 or 13 "at any

time, if the case has not been converted under section 1112, 1208, or 1307 of this

title."  Here, Debtors stipulated—with IIB—to convert from chapter 11 to chapter

7.  That conversion was necessarily based on § 1112, thus Debtors have no ability

or right to convert the case back to chapter 11 under § 706(a), and the

Dismissal/Reconversion Motion must fall under § 706(b).[38]  *See, e.g.*, *In re Home*

---

[38]  Since the Court was not asked to, and did not, make findings under § 1112(b), and
(continued...)

MEMORANDUM OF DECISION - 23

*Network Builders, Inc.*, 2006 WL 3419791, at *3 (D.N.J. Nov. 22, 2006) ("Where

a debtor has previously been converted from Chapter 11, . . . reconversion back to

Chapter 11 is governed by subsection (b) of § 706.").  That subsection provides:

> (b) On request of a party in interest and after notice and a
> hearing, the court may convert a case under this chapter to a case under
> chapter 11 of this title at any time.

The Bankruptcy Appellate Panel for the Eighth Circuit held that:

> "[t]he decision whether to convert [under § 706(b)] is left in the sound
> discretion of the court, based on what will most inure to the benefit of
> all parties in interest." *Willis*, 345 B.R. 647 at 654[39] (quoting H.R.
> Rep. No. 595, 95th Cong., 1st Sess. at 380 (1977), *reprinted in* 1978
> U.S.C.C.A.N. 5963; S. Rep. No. 989, 95th Cong. 2d Sess. at 94 (1978),
> *reprinted in* 1978 U.S.C.C.A.N. 5787) (internal quotation marks
> omitted).  Section 706(b) does not provide guidance regarding the
> factors a court should consider. *In re Quinn*, 490 B.R. 607, 621–22,
> 2012 WL 6737484, at *10 (Bankr. D.N.M. Dec. 28, 2012). "Since there
> are no specific grounds for conversion, a court 'should consider
> anything relevant that would further the goals of the Bankruptcy
> Code.'" *Proudfoot Consulting Co. v. Gordon (In re Gordon)*, 465 B.R.
> 683, 692 (Bankr. N.D. Ga. 2012) (quoting *In re Lobera*, 454 B.R. 824,
> 854 (Bankr. D.N.M. 2011).

*Schlehuber v. Fremont Nat'l Bank & Trust Co. (In re Schlehuber)*, 489 B.R. 570,

573 (8th Cir. BAP 2013).

> *Home Network Builders* also observed that:

---

[38] (...continued)
given the nature of the motion advanced by Debtors and IIB, the conversion necessarily occurred
under § 1112(a).

[39]  *Willis v. Rice (In re Willis)*, 345 B.R. 647 (8th Cir. BAP 2006).

MEMORANDUM OF DECISION - 24

In determining whether conversion from Chapter 7 to Chapter 11 under § 706(b) will most inure to the benefit of all parties in interest, including both creditors and debtors, courts consider the factors in § 1112(b). . . . The § 1112(b) factors are considered because "[i]f cause exists to reconvert from Chapter 11 under § 1112(b), conversion from Chapter 7 under § 706(b) would be a futile and wasted act." *In re Ryan*, 267 B.R. [635,] 637 [(Bankr. N.D. Iowa 2001)].

2006 WL 3419791, at *3. As the movants, Debtors bear the burden of showing good cause for, and benefit to creditors from, reconversion.

### a.     Debtors' showing in support of conversion was inadequate.

The conversion to chapter 11 is premised on the idea that Debtors, when they are once again in control of their assets, will be able to generate substantial sums of money as they allegedly did prior to the initial 2011 filing. But this focus on the prebankruptcy era's success is flawed. Reconversion puts Debtors back into a chapter 11. During their chapter 11, from 2011 to 2013, Debtors were not able to generate the same or similar income as they had before 2011 and, given the consumption of income for personal and other expenses, minimal amounts were left for creditors.

Moreover, Frantz testified that even being in a bankruptcy case was a disqualifying condition or event for his participation in syndicating, resyndicating, and rehabbing the affordable housing projects. Whether this was through covenants in partnership agreements or by reason of governmental regulations (or both) was not entirely clear, but Frantz was unequivocal in identifying the

MEMORANDUM OF DECISION - 25

significant problems that bankruptcy posed.  Indeed, he testified that even a prior

discharge entered in a bankruptcy case would be a problem in his line of work.

Thus, substantial issues were identified that would have to be resolved for a

Debtor-directed chapter 11 reorganization to succeed.[40]  That Debtors could

effectively reorganize (or even liquidate) in a chapter 11 was a proposition not

established by their proof.[41]

In addition, Debtors did not adhere to the fiduciary requirements and duties

imposed on them as debtors in possession while previously in chapter 11.

---

[40]  Debtors' brief in support of the motion indicates that: "[T]he value of his projects are
not in the physical value of the assets, . . . rather the value comes from the opportunity to obtain
affordable housing tax credit sales.  Resyndication and refinancing of the projects, REIT sales
with leasebacks, conservation easements and restructuring of partnerships are various methods to
obtain cash for creditors.  It is a combination of the general partnership rights and privileges and
the knowledge that Mr. Frantz has from thirty years building these affordable housing projects
which give value.  However, without control as the general partner and access to capital markets,
the assets are worth very little to Mr. Frantz or the trustee."  This aspect of the brief appeared to
be addressing dismissal of the case.  But the alternative relief sought, of reconversion to chapter
11, is also advocated.  Debtors' brief even suggests they can propose a confirmable plan, and
obtain acceptance thereof by impaired creditors.  But the evidence at the March hearing raises
serious issues of feasibility, given the testimony of the debilitating, indeed fatal, ramifications for
the partnership projects from Frantz' pending bankruptcy.

[41]  Martin Frantz' declaration is illuminating.  In attempting to support the ultimately
unsuccessful "partial" waiver of discharge, Frantz asserted that the initial bankruptcy filing was
intended to provide a means to force a settlement with IIB that had not been achieved in state
court.  He stated: "As soon as a settlement could be reached, I planned to withdraw from
bankruptcy without any discharges; since that is the only way I can re-establish access to national
credit and investor syndication/REIT markets, go back to work, and regain my past earnings
ability[.]  . . .  It's important to understand that in the finance world in which I work, if I have any
creditors discharges on my record I will never be eligible to develop another project for the rest of
my life."  Doc. No. 401 at 2.  He also stated that he "agreed to convert the case to a chapter 7
desiring to extend my opportunity to settle [with IIB] and again avoid the high cost of civil court
litigation believing that a settlement was still imminent.  Again, when a settlement is reached, as
in the prior plan, I would withdraw from bankruptcy without any discharges since again it's the
only way I could re-establish access to financial markets[.]"  *Id.* at 2–3.  "While the state court
litigation [with IIB] froze my access to credit and national syndication/REIT capital markets, the
bankruptcy filing has done the same thing."  *Id.* at 3.

MEMORANDUM OF DECISION - 26

Accurate and complete disclosures of assets and liabilities were lacking.
Amendments were not proactive, but merely responsive to omissions and errors
discovered by creditors, the UST and Trustee. Significant events and transactions
went undisclosed and unreported. Several appear to violate the Code because they
lacked notice and Court approval. And even those that arguably could fit within
the ordinary course of business were inadequately disclosed and documented.

Moreover, in weighing the evidence, the Court sees the impetus for
reconversion, like dismissal, as less of a desire to pay all debts than it is an attempt
to control or impact the litigation with IIB. It is unclear whether Debtors believe
reconversion to chapter 11 will require a vacation of the pending trial in the
§ 523(a) adversary proceeding, something they have already attempted to achieve
in several ways. If they do, they are wrong. Under § 1141(d)(2), a discharge of an
individual in a chapter 11 case is not effective as to debts excepted from discharge
under § 523. This, therefore, requires resolution of the IIB adversary proceeding
even were the case to be reconverted.

In addition to the prior authorities, in *In re Young*, 269 B.R. 816, 825
(Bankr. W.D. Mo. 2001), synthesized several factors from case law to determine if
conversion from chapter 7 to chapter 11 is appropriate:

> (1) Whether the conversion is sought in good faith;
> (2) Whether the debtor can propose a confirmable plan;
> (3) The impact on the debtor of denying conversion weighed against the
> prejudice to creditors caused by allowing conversion;
> (4) The effect of conversion of the efficient administration of the

MEMORANDUM OF DECISION - 27

bankruptcy estate, including the likelihood of reconversion to Chapter 7;

(5) Whether conversion would further abuses of the bankruptcy process and would serve to pervert, rather than implement, congressional policy.

The Court finds that while not binding, these factors are instructive and "provide a good, basic, guideline" to evaluate a request for conversion. *Id.* Moreover, the Court finds, given the evidence presented, that the factors identified in *Young* all weigh against the Dismissal/Reconversion Motion.

Having considered the whole of the record, the Court, in the exercise of its informed discretion, concludes that reconversion of the case to chapter 11 is not in the best interests of creditors of the estate, and would not further the goals of the Code. The request for reconversion to chapter 11 will be denied.

## B.    Stay Relief Motion

Debtors seek stay relief in order to defend against IIB's assertion of liability and present affirmative defenses to those claims. But a state court action is not necessarily required to determine liability.[42]

It is well accepted that this Court can establish the amount of a debtor's liability in the process and context of determining whether such debt is nondischargeable. *Cowan v. Kennedy (In re Kennedy)*, 108 F.3d 1015, 1017–18 (9th Cir. 1997). *See also Sasson v. Sokoloff (In re Sasson)*, 424 F.3d 864, 867–70

---

[42] Debtors' answer, Adv. Doc. No. 16, already asserts their affirmative defenses. Thus, adjudication of the adversary proceeding already includes consideration of those defenses.

(9th Cir. 2005); *Stanbrough v. Valle (In re Valle)*, 469 B.R. 35, 40–43 (Bankr. D. Idaho 2012).  And the Bankruptcy Appellate Panel determined that not only can the bankruptcy court enter a monetary judgment on a disputed state law claim in the course of determining a debt's dischargeability, but such adjudication remains within both the jurisdiction and constitutional authority of the bankruptcy court even after *Stern v. Marshall*, 131 S. Ct. 2594 (2011).  *Deitz v. Ford (In re Deitz)*, 469 B.R. 11 (9th Cir. BAP 2012) (adopted by the Ninth Circuit in its entirety at 760 F.3d 1038, 1039 (9th Cir. 2014)).[43]

Given this jurisdictional and substantive law underpinning, the alleged "cause" advanced by Debtors for stay relief is unpersuasive.  Lifting the stay to allow state court litigation on IIB's claim, and Debtors' defenses to such claim, is not necessary.  Moreover, that it is urged at this late date, and when trial will commence now in five weeks on the same issue in this Court, speaks to strategic desires rather than principled ones.[44]

---

[43]  These authorities belie the argument in the Stay Relief Motion that stay relief is warranted "to resolve *this question of pure, state law* in the state court where it all began." Doc. No. 425 at 2 (emphasis added).  The "state law" issue of liability on the claim is subsumed in the process of adjudicating the claim's dischargeability.  That bankruptcy issue of dischargeability, of course, was triggered by Debtors' filing a voluntary petition for relief under Title 11 over 3½ years ago.

[44]  As noted earlier, this is not the first attempt to avoid the commencement of the trial in the adversary proceeding.  At a pretrial conference in December 2013 with Debtors' and IIB's respective counsel, the Court set a trial for a year later, to commence on December 1, 2014.  In October 2014, Debtors sought to vacate and continue that trial.  Their motion, following hearing and argument, was denied.  Debtors then filed motions to disqualify IIB's expert witnesses and IIB's counsel.  Those motions required a hearing, and Debtors were thus successful in obtaining a continuance of the trial that was to start December 1.  But these motions themselves were found,

(continued...)

MEMORANDUM OF DECISION - 29

The authorities cited by Debtors, including *In re Arundotech*, LLC, 2009 WL 7809008 (9th Cir. BAP May 4, 2009), and this Court's decision in *In re Tactical Ordinance & Equip. Corp.*, 2005 WL 4705285 (Bankr. D. Idaho Mar. 17, 2005), are inapposite. While there are times, particularly early in the bankruptcy, when allowing a ready-to-try matter to be adjudicated in another forum is in the best interests of the parties and the Court, this is not such a situation. The several factors that this Court can in its discretion evaluate include two that weigh heavily here.

First, Debtors argue that state court litigation will result in a complete adjudication of the issue of whether IIB has a claim against them, and that this will not interfere with matters before this Court because "there is not as yet any adversary proceeding on the matter of liability." Doc. No. 425 at 3. The complaint's allegations and prayer, and the foregoing analysis of this Court's jurisdiction and authority in determining a debt's nondischargeability, overcome that assertion.[45]

Second, the interests of judicial economy and the expeditious and

---

[44] (...continued)
after a two-day evidentiary hearing, to lack any merit. The trial was reset and will start May 26, 2015.

[45]   In addition, as discussed in an earlier footnote, IIB filed a timely proof of claim in January 2012 for approximately $6.4 million. Filed claims are allowed unless an objection is raised and sustained, *see* §§ 501, 502, and a filed proof of claim is prima facie evidence of validity and amount, *see* Rule 3001(f). Here, there has been no objection to IIB's claim. If any portion of the claim is not fully addressed in the adversary proceeding, there are avenues available to resolve it.

MEMORANDUM OF DECISION - 30

economical determination of litigation for the parties strongly supports completing

the trial that pends in this Court. Debtors assert the state court trial was some five

months off when they filed bankruptcy. While IIB disputes much of Debtors'

characterization of the status of the state court litigation, even assuming it was

once set for trial, Debtors failed to establish how quickly a state court trial would

be reset if stay relief were granted. It is patently implausible that a state court trial

could be rescheduled to occur before the trial in the adversary proceeding at the

end of May 2015.

While there are other factors that could be discussed, they simply add

additional support to the Court's conclusion that stay relief to allow state court

litigation to recommence is unwarranted. There is inadequate "cause" to grant

such relief, and the Stay Relief Motion will be denied.[46]

Debtors also urge "abstention" under 28 U.S.C. § 1334(c) under which the

Court would abstain from hearing Adv. No. 13-07024-TLM in deference to the

state court litigation (presumably the stayed 2010 litigation).

Mandatory abstention under § 1334(c)(2) requires seven elements: (1) a

timely motion; (2) a purely state law question; (3) a non-core proceeding, 28

U.S.C. § 157(c)(1); (4) a lack of independent federal jurisdiction absent the

petition under Title 11; (5) that an action is commenced in state court; (6) the state

---

[46] Debtors' arguments regarding "jurisdiction" to adjudicate claims, *see* Doc. No. 425 at 4–6, are adequately resolved by *Deitz*, and need not be further discussed.

court action may be timely adjudicated; and (7) a state court forum of appropriate

jurisdiction exists.  *Krasnoff v. Marshack (In re General Carriers Corp.)*, 258 B.R.

181, 189-90 (9th Cir. BAP 2001).  *See also Gonzales Constr. Co. v. Fulfer (In re*

*Fulfer)*, 159 B.R. 921, 923 (Bankr. D. Idaho 1993); *Bowen Corp. v. Security*

*Pacific Bank Idaho, F.S.B.*, *(In re Bowen Corp.)*, 150 B.R. 777, 781–82 (Bankr. D.

Idaho 1993).  The required factors are not present.

The Stay Relief Motion, to the extent it embodies a request for abstention,

was not "timely filed."  If sincerely premised, rather than an eleventh-hour

strategy, the question of abstention could and should have been raised

months—indeed, years—ago.

Also, the dispute between IIB and Debtors is not a "purely" state law issue,

nor are the matters non-core.  The fundamental issue in the adversary proceeding is

the extent and dischargeability of IIB's claim against Debtors.  The complaint

seeks a determination of the amount of the debt and a determination that such

claim should be found nondischargeable under § 523(a).  This is a matter of core

jurisdiction.  28 U.S.C. § 157(b)(2)(I).[47]  Indeed, this Court has not just core but

exclusive jurisdiction over IIB's § 523(a)(2) and § 523(a)(6) claims.  *See*

*Ackerman v. Eber (In re Eber)*, 687 F.3d 1123, 1128 (9th Cir. 2012).  Thus, if

Debtors' Stay Relief Motion were granted and their theory followed, the parties

---

[47]  IIB's complaint alleged that the matter was core under 28 U.S.C. § 157(b)(2)(I).  Adv.
Doc. No. 1 at 2, ¶¶ 2, 5.  Debtors' answer admitted both those paragraphs of the complaint.  Adv.
Doc. No. 16 at 1–2.

MEMORANDUM OF DECISION - 32

would be required to litigate on two fronts, a situation that does not promote judicial economy. *See also Deitz, supra*.

Permissive abstention under § 1334(c)(1) is evaluated by the Court using similar factors. *Jones v. State Farm Mut. Auto Ins. Co., (In re Jones)*, 410 B.R. 632, 640–41 (Bankr. D. Idaho 2009) (citing *Christensen v. Tucson Estates, Inc. (In re Tucson Estates, Inc.)*, 912 F.3d 1162, 1167 (9th Cir. 1990)). The decision whether to permissively abstain is committed to the Court's discretion.[48] In *Jones*, this Court declined to so abstain, noting that "On balance, the Court concludes the factors weigh in favor of retaining the adversary proceeding in bankruptcy court, and not abstaining." *Id.* at 641. The Court, having evaluated all arguments, and the required factors, reaches the same conclusion in the instant case.[49]

The Court concludes that abstention under either 28 U.S.C. § 1334(c)(1) or (c)(2) is not persuasively advanced or appropriate, and the Stay Relief Motion, to the extent it seeks such relief, will also be denied.

**CONCLUSION**

On the foregoing findings, conclusions and analysis, Debtors' Dismissal/Reconversion Motion and Stay Relief Motion will be denied. The Court

---

[48] *Eastport Assocs. v. City of Los Angeles (In re Eastport Assocs.)*, 935 F.2d 1071, 1075–76 (9th Cir. 1991); *Falk v. Falk (In re Falk)*, 2013 WL 5405564, at *8 (9th Cir. BAP Sept. 26, 2013).

[49] Another comment in *Jones* is fully apropos here: "The Court is . . . concerned that . . . Defendant's request for abstention may be motivated by a desire for what Defendant considers a more favorable forum, or perhaps simply as a means to delay resolution on the merits. Prolongation of the action only serves to cause both parties to expend more time and more money in litigation costs." *Id.* at 641.

MEMORANDUM OF DECISION - 33

will enter an order accordingly.

DATED: April 16, 2015



TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE